1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9    Betty Ann St. George, *et al*.,                )    No. CV-04-1210-PCT-LOA
                                                     )
10             Plaintiffs,                           )    **ORDER**
                                                     )
11   vs.                                             )
                                                     )
12                                                   )
     Home  Depot  U.S.A.,  Inc.,  a  foreign)
13   corporation; *et al*.,                          )
                                                     )
14             Defendants.                           )
                                                     )
15   _____)

16

17         This order addresses solely whether Plaintiffs' claims of intentional inflection

18   of emotional distress ("IIED"), alleged in Count Six of the Third Amended Complaint,

     survive Defendants' Motion for Summary Judgment on Plaintiffs' Intentional Infliction of
19
     Emotional Distress Claim (Count VI) (docket # 353), filed on June 30, 2006.  Because these
20
     tort claims are not matters governed by the U.S. Constitution or federal law, the district court
21
     must apply Arizona substantive law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58
22
     S.Ct. 817, 822, 82 L.Ed. 1188 (1938).
23
           Oral argument on the IIED claims was scheduled for November 28, 2006.
24
     Instead of hearing oral argument on this date and as a result of Plaintiffs' procedural defects,
25
     the Court conducted an informal conference with counsel and gave Plaintiffs a very limited
26

27

28

1   second opportunity to comply with LRCiv 56.1(b)[1] and address their deficient Statement of

2   Facts.  Both sides were also permitted to provide additional briefing on legal issues solely

3   related to IIED claims[2] under Arizona law. Plaintiffs thereafter failed to timely file a

4   supplemental citation to the record[3] so the Court will now "rul[e] upon the pending

5   dispositive motions with the mindset that if Plaintiffs have not specifically cited where in the

6   record such factual allegation exists, it must not exist." (docket # 394 at 3)  *Carmen v. San*

7   *Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court

8   need not examine the entire file for evidence establishing a genuine issue of fact, where the

9   evidence is not set forth in the opposing papers with adequate references so that it could

10  conveniently be found."); *Albrechtsen v. Board of Regents of University of Wisconsin System*,

11  309 F.3d 433, 436 (7th Cir. 2002) ("'Judges are not like pigs, hunting for truffles in' the

12  record.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

13          Oral argument would not aid the Court's decisional process. *Mahon v. Credit*

14  *Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir.1999). After considering all

15  briefing including the supplemental briefing, the parties' Statements of Facts, relevant

16  Arizona and other persuasive case law, the Court concludes that no genuine disputes of

17  material fact exist whether Defendants are liable to any of the Plaintiffs for IIED and,

18

19

_____

20  [1] LRCiv 56.1(b) provides, in part, that "for each paragraph of the moving party's

21  separate statement of facts, a correspondingly numbered paragraph indicating whether the
    party disputes the statement of fact set forth in that paragraph and a reference to the specific

22  admissible portion of the record supporting the party's position if the fact is disputed. . . ."

23  [2] Those issues are (1) the appropriate Arizona statute of limitations on a claim of

24  intentional infliction of emotional distress, and (2) whether only expert testimony, e.g., a
    physician or psychologist, may create a question of fact that a plaintiff sustained emotional

25  distress caused by a defendant's conduct and, if not, whether a party or other non-expert

26  witness may appropriately testify regarding personal opinions, observations, personal
    experiences, such as, commonly-known symptoms of emotional distress, such as, nightmares,

27  caused by a defendant's conduct and/or failure to act when required to do so. (docket # 394)

28  [3] Orders filed on December 21, 2006 and January 9, 2007. (docket # 396 and # 403)

1  therefore, Defendants are entitled to summary judgment on all IIED claims as a matter of law.

2  **FACTUAL BACKGROUND**[4]

3  This sexual harassment lawsuit was filed on June 14, 2004 by twenty-one (21)

4  women (collectively "Plaintiffs")  who currently work or worked at the Home Depot store

5  # 452 ("Home Depot" or "the store") in Prescott, Arizona, alleging that they were subjected

6  to a hostile work environment by Home Depot, its male store manager and two assistant male

7  store managers, and five male co-employees in violation of Title VII of the Civil Rights Act

8  of 1964 ("the Act"). (docket # 1 and # 47)    Plaintiffs claim that Home Depot, its three

9  managers, and several co-employees[5] "exposed [Plaintiffs] to systematic and continuous

10  [inappropriate] sexual references, innuendos, jokes, demonstrations[,] verbal and physical

11  abuse by male employees, including [] being exposed on a regular basis to explicit and

12  graphic sexual references, demonstrations and sexually suggestive and provocative

13  language."  (docket # 47 at 5)  Plaintiffs contend that they were thereby subjected to a

14  "hostile work environment, as defined by the Act, because of their gender." (*Id*. at 6)

15  Plaintiffs further claim that after they reported the inappropriate behavior to the store's

16  managers and asked that it be stopped, Defendants failed "to intervene, take corrective action

17  against the offending male employees, and otherwise protect [Plaintiffs] from continued

18  harassment." (*Id*.) Plaintiffs assert that the harassment began shortly before the store opened

19  to the public in December, 1997, and continued to March 23, 2005, when Plaintiffs filed their

20  Third Amended Complaint.

21  _____

22  [4] The Court incorporates by this reference the relevant factual discussion set forth in

23  the Court's November 2, 2006 order. Although possibly relevant to other claims, the facts identified herein are identified for purposes of the IIED claims only.

24  [5] Richard Nelson, Dave Musen, Alan Dempsey, Kenny Anderson and Bob Radcliff

25  were initially named as defendants but were dismissed from this lawsuit by stipulation on July 14, 2005. (docket # 108)  Phyllis Herchenroeder, a plaintiff, was also dismissed by

26  stipulation on January 21, 2005. (docket # 29)

27  The Court will not address the Defendants' liability, if any, for any third-party, non-employee (customer) sexual harassment to Plaintiffs as such claims have not been alleged

28  in the Third Party Complaint.

1    Count Six, the IIED claim, alleges that "over many years," Defendants "knew
2    or should have known that the Individual Defendants' conduct was repulsive, shocking and
3    harassing," that such conduct "was extreme and outrageous, [that] Defendants intended to
4    cause emotional distress or recklessly disregarded the likelihood that Plaintiffs would be
5    distressed from their conduct, and that Defendants' conduct did cause severe emotional
6    distress." (docket #47, ¶¶ 78 - 80)  Defendants' Motion and Reply (docket # 371) on the IIED
7    claims go through the record with factual specificity as to each of the twenty-one Plaintiffs.
8    Plaintiffs' Response (docket # 362) does likewise. The Court has reviewed and considered
9    each Plaintiff's IIED claim individually in light of the parties' allegations and briefing.

10    Plaintiffs contend that during some of the time Plaintiffs allege they were
11    subjected to extreme and outrageous conduct, the Prescott Home Depot was subject to a
12    consent decree ("*Butler* Decree").  In an action entitled *Butler, et al. v. Home Depot, Inc.*,
13    Civil Action No. C94-4335 SI, brought in the United States District Court for the Northern
14    District of California, allegations were made that Home Depot engaged in a pattern or
15    practice of sexual harassment discrimination on the basis of gender. (Plaintiffs' Statement of
16    Facts ("PSOF") ¶ 69)  The Decree, entered on January 14, 1998, outlined several corrective
17    measures and preventative steps that Home Depot's Western Region stores were required to
18    make. (PSOF ¶ 70; Exhibit ("Exh.") 22)  The California District Court directed that the
19    provisions of the *Butler* Decree remain in effect for five years after its effective date, ending
20    on January 14, 2003, which was later shortened to January 14, 2002. (PSOF ¶ 71)  The
21    Decree included provisions for the prevention of sexual harassment at all the Home Depot
22    stores in the western region of the United States which included provisions that Home Depot
23    shall provide to each of its officers, directors, and associates in the West Coast Division a
24    copy of the Notice and Summary of Consent Decree, explaining the Company's duties and
25    obligations under the *Butler* Decree, (PSOF ¶ 74), and that Home Depot shall provide
26    progress reports to designated counsel concerning Home Depot's compliance with the
27    Decree's requirements. (PSOF ¶ 75)

28

1    Plaintiffs contend that from December 1997 until January 2002, while the

2   provisions of the *Butler* Decree were in force, Plaintiffs complained of sexual harassment,

3   both verbally and in writing, primarily to male supervisors, including Store Managers Dave

4   Musen, his successor, Defendant Felix Pareja, and other assistant store managers. (PSOF ¶

5   24; docket # 362 at 4)  Moreover, Plaintiffs assert that the Prescott Home Depot had no

6   person who served in any human resource capacity for the first two months of operation

7   (January to March 1998), and did not have a human resource manager ("HRM") until January

8   2002, four years after the store opened. (PSOF ¶ 25)  Notwithstanding the lack of an HRM

9   for four years after its opening, the Prescott Home Depot assigned employees to assume the

10   responsibility for human resource-type functions from March 1998 to January 2002. (PSOF

11   ¶ 26)  Plaintiffs allege they regularly complained to the Prescott Home Depot's human

12   resource administrators/managers; however, the sexual harassment did not cease, and, in

13   many instances according to Plaintiffs, intensified after Plaintiffs complained about it. (PSOF

14   ¶ 27)  Plaintiffs also provide some evidence that Defendant John Johnson, an Assistant Store

15   Manager, and Priscilla Ingolia ("Ingolia"), who both assumed HRM responsibilities at

16   different times, never received the training or a copy of the *Butler* Decree required by the

17   Decree itself. (docket # 362 at 8-10)  Plaintiffs contend that Ingolia was promoted to the

18   position of Human Resource Manager in approximately January, 2002. (PSOF ¶ 61; Exh. 42

19   at 82:22-25)

20    Also pertinent to Plaintiffs' IIED claims, according to Plaintiffs, is that the

21   Prescott Home Depot had, at all relevant times, various policies and procedures governing

22   employee conduct in the workplace, including: 1) an Harassment and Discrimination Policy;

23   2) a Respect Policy; and 3) a Code of Conduct. (PSOF ¶ 91)  Plaintiffs claim that Home

24   Depot's collective policies and procedures on harassment, discrimination, respect, and other

25   areas governing conduct by associates and managers are contained in the Guide distributed

26   to new associates at the time of hire. (PSOF ¶ 92) (docket # 362 at 11)

27    Defendants' Motion for Summary Judgment on Count Six contends "that none

28   of the alleged acts [of sexual harassment] rise to the level of 'extreme,' 'outrageous,'

1    'atrocious,' or 'utterly intolerable in a civilized community' - the standard that Arizona law

2    demands for an [IIED] claim." (docket # 353 at 21)  The Motion discusses the individual

3    factual allegations and claims for each Plaintiff and argues that the specific conduct alleged

4    for each Plaintiff does not reach the level of extreme and outrageous behavior necessary to

5    create liability under Arizona law and/or that each Plaintiff did not suffer the requisite degree

6    of severe emotional distress required under Arizona law to sustain an IIED claim. (*Id*. at 21,

7    24)

8                                **SUMMARY JUDGMENT**

9              This Court sufficiently identified the controlling standard and case law on

10   summary judgment in its November 2, 2006 order which will not be entirely duplicated

11   herein. Particularly worth repeating, however, is the following.

12             The party opposing summary judgment "may not rest upon the mere allegations

13   or denials of [the party's] pleadings, but. . . must set forth specific facts showing that there

14   is a genuine issue for trial." Rule 56(e), FRCvP; *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

15   *Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986); *Brinson v. Lind Rose Joint*

16   *Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995). There is no issue for trial unless there is

17   sufficient evidence favoring the nonmoving party.  If the evidence is merely colorable or is

18   not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby,*

19   *Inc.*, 477 U.S. 242, 249-50 (1986).  However, "[t]he evidence of the non-movant is to be

20   believed, and all justifiable inferences are to be drawn in his [or her] favor." *Id*. at 255

21   (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  In evaluating the

22   evidence submitted by both parties, all evidence and inferences to be drawn therefrom must

23   be construed in the light most favorable to the nonmoving party. *T.W. Elec. Services v.*

24   *Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630-31 (9th Cir.1987).

25             Whatever facts which may establish a genuine issue of fact must both be in the

26   district court's file and set forth in the opposing pleadings and statement of facts. *Carmen v.*

27   *San Francisco Unified School District*, 237 F.3d 1026, 1029 (9th Cir. 2001).  The trial court:

28

                                        - 6 -

1    may determine whether there is a genuine issue of fact, on summary judgment,
     based on the papers submitted on the motion and such other papers as may be
2    on file and specifically referred to and facts therein set forth in the motion
     papers.   Though the court has discretion in appropriate circumstances to
3    consider other materials, it need not do so. *The district court need not examine
     the entire file for evidence establishing a genuine issue of fact, where the
4    evidence is not set forth in the opposing papers with adequate references so
     that it could conveniently be found.*

5    *Id.* at 1031 (emphasis added).

6    Additionally, on a motion for summary judgment, the trial court is not permitted to weigh the

7    evidence, pass upon credibility, or speculate as to the ultimate findings of fact. *Pepper &*

8    *Tanner, Inc. v. Shamrock Broadcasting, Inc.*, 563 F.2d 391, 393 (9th Cir. 1977). Moreover,

9    in considering a motion for summary judgment on a diversity action, the district court looks

10   to the relevant state substantive law. *Anderson*, 477 U.S. at 248. The parties agree that the

11   IIED claims are governed by Arizona substantive law.

12                    **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

13           A claim for intentional infliction of emotional distress, also called the "Tort of

14   Outrage," requires proof of three elements: "first, the conduct of the defendant must be

15   extreme and outrageous; second, the defendant must either intend to cause emotional distress

16   or recklessly disregard the near certainty that such distress will result from his conduct; and

17   third, severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen*

18   *Publishing Co. v. Miller*, 210 Ariz. 513, 516, 115 P.3d 107, 110 (Ariz. 2005) (citing *Ford v.*

19   *Revlon*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (Ariz. 1987) (upholding jury verdict for the

20   plaintiff where defendant employer's failure to address plaintiff's repeated complaints of

21   physical assault and sexual harassment led plaintiff to attempt suicide) (citing *Restatement*

22   *(Second) of Torts* § 46 (1965)).

23

24   **1. Extreme and Outrageous Conduct**

25           Under the first element, a plaintiff "may recover for [IIED] only where the

26   defendant's acts are 'so outrageous in character and so extreme in degree, as to go beyond

27   all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a

28   civilized community.'" *Patton v. First Fed. Sav. & Loan Ass'n of Phoenix*, 578 P.2d 152,

1    155 (Ariz.1978) (quoting *Cluff v. Farmers Ins. Exch.*, 10 Ariz.App. 560, 460 P.2d 666, 668

2    (1969), *overruled on other grounds*, *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335,

3    783 P.2d 781, 784 (1989); *Ford v. Revlon*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987);

4    *Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (Ariz. 1999).

5             In Arizona, "conduct necessary to sustain an [IIED] claim falls at the very

6    extreme edge of possible conduct." *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 258,

7    619 P.2d 1032, 1035 (Ariz. 1980) (upholding directed verdict where the defendant nursing

8    home failed to notify the plaintiff that her husband was terminally ill).   An IIED "claim

9    cannot arise out of conduct which merely hurts one's feelings." *Cluff*, 10 Ariz.App. at 562,

10   460 P.2d at 668. "Even if a defendant's conduct is unjustifiable, it does not necessarily rise

11   to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an

12   average member of the community to believe it is 'outrageous.'" *Nelson v. Phoenix Resort*

13   *Corp.*, 181 Ariz. 188, 199, 888 P.2d 1375, 1386 (Ariz. Ct. App.1994);  *Lucchesi v. Frederic*

14   *N. Stimmel, M.D.*, 149 Ariz. 76, 716 P.2d 1013 (Ariz. 1986) (holding that doctor's alleged

15   misconduct leading to the decapitation of a baby during a high-risk delivery created a jury

16   question on an IIED claim). "'Generally, [an IIED claim] is one in which the recitation of

17   facts to an average member of the community would arouse his [or her] resentment against

18   the actor, and lead him [or her] to exclaim 'Outrageous!'" *Cluff*, 10 Ariz. App. at 562, 460

19   P.2d at 668 (citing *Restatement (Second) Torts* Section 46, comment (d) (1965)).  A plaintiff

20   bears the burden of proving that a defendant's conduct was extreme and outrageous and

21   caused plaintiff severe emotional distress; however, in Arizona physical injury need not

22   occur.  *Pankratz v. Willis*, 155 Ariz. 8, 744 P.2d 1182 (Ariz. Ct. App.1987); *Nelson*, 181

23   Ariz. at 199, 888 P.2d at 1386.

24             Not every instance of sexual harassment, even if actionable under Title VII,

25   rises to the level of intentional infliction of emotional distress. *Stingley v. Arizona*, 796 F.

26   Supp. 424, 431 (D. Ariz. 1992). "[Title VII] discrimination occurs at a much lower threshold

27   of inappropriate conduct than the threshold required for the tort of intentional infliction of

28   emotional distress. Thus, the fact that there is a Title VII hostile environment does not

1   necessarily support a claim of [IIED]." *Id.* at 431. The Arizona Supreme Court in *Ford*,

2   however, stated in *dicta* that "[IIED] is often based upon claims of sexual harassment," citing

3   1 L. Larson, *Employment Discrimination* § 41.67(b), at 8-148 (1984), 734 P.2d at 585, but

4   at a later time the Arizona Court of Appeals concurred with the Third Circuit that "[i]t is

5   extremely rare to find conduct in the employment context that will rise to the level of

6   outrageousness necessary to provide a basis for recovery for the tort of intentional infliction

7   of emotional distress." *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554, 905 P.2d

8   559, 563 (1995) (citing *Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3d Cir.1988), *cert.*

9   *denied*, 498 U.S. 811 (1990).

10          Citing comment h to the *Restatement (Second) of Torts* § 46, the Arizona

11  Supreme Court in *Lucchesi* stated:

12          It is for the court to determine, in the first instance, whether the defendant's
            conduct may reasonably be regarded as so extreme and outrageous as to permit
13          recovery, or whether it is necessarily so. *Where reasonable [persons] may*
            *differ, it is for the jury, subject to the control of the court, to determine*
14          *whether, in the particular case, the conduct has been sufficiently extreme and*
            *outrageous to result in liability.*
15

16  *Lucchesi,* 149 Ariz. at 79, 716 P.2d at 1016 (emphasis in original).  The trial court, therefore,

17  acts as society's conscience to determine whether alleged acts "can be considered as extreme

18  and outrageous conduct in order to state a claim for relief." *Cluff*, 10 Ariz.App. at 562, 460

19  at 668.

20          Recent employment discrimination cases decided in the United States District

21  Court for the District of Arizona are persuasive on whether the alleged conduct meets the

22  high criteria for the first element: whether the alleged conduct was "so outrageous in

23  character and so extreme in degree, as to go beyond all possible bounds of decency, and to

24  be regarded as atrocious and utterly intolerable in a civilized community" to warrant a jury

25  trial. *Stingley*, 796 F. Supp. at 424 (male co-workers calling plaintiff the nickname "I.B.T.,"

26  an abbreviation for "itty bitty titties"; co-employee allegedly physically poking at plaintiff's

27  buttock twice with a plastic fork, explaining that he was checking to see if "the meat was

28  done"; and on one occasion, a male coworker walking up behind plaintiff and snapping her

1  bra were insufficient to create a jury question on IIED claim especially when plaintiff

2  complained to her employer and the offenders were terminated, demoted and reprimanded);

3  also see *Tempesta v. Motorola, Inc.*, 92 F.Supp.2d 973, 986-87 (D.Ariz.1999); *Mosakowski*

4  *v. PSS World Med., Inc.*, 329 F.Supp.2d 1112, 1131 (D.Ariz.2003); *Coffin v. Safeway, Inc.*,

5  323 F. Supp.2d 997, 1007 (D. Ariz. 2004) (refusing to dismiss an IIED claim based on sexual

6  harassment because plaintiff met minimum pleading requirements)[6]; *Higby v. Newby*, No.

7  CV-03-0899-PHX-SMM, 2006 WL 359862 (D. Ariz. February 15, 2006) (co-employee's

8  alleged conduct included sexual comments to plaintiff that he wanted to grab her breasts and

9  put his face between them, shake his head back and forth, and make a noise; actually

10  grabbing plaintiff and pulling her down onto his lap in the employee lounge; and on a

11  different occasion, grabbing plaintiff from behind under her breasts, lifting her up and

12  rubbing his penis against her buttocks for 40 seconds created a question of fact on extreme

13  and outrageous conduct but because plaintiff did not show that she suffered "severe"

14  emotional distress, summary judgment was granted on the IIED claim); *Walls v. Sonora*

15  *Behavioral Health Hosp.*, No. CV-05-201-TUC-CKJ, 2006 WL 1127148 (D. Ariz. 2006)

16  (complaint stated IIED claim with allegations that co-employee's/offender's conduct included

17  asking plaintiff to have sex with him in his "fuck-mobile" in the parking lot of the employer's

18  premises; touching plaintiff's shoulder suggestively, telling her "Let me touch you" after

19  plaintiff complained of his behavior; licking his tongue suggestively while looking at

20  plaintiff; allegedly sexually assaulting plaintiff's daughter, also a co-employee, at a time

21  when the offender allegedly knew plaintiff's other daughter was hospitalized and later died

22  and plaintiff was emotionally vulnerable).

23  **2. Severe Emotional Distress**

24  ───────────────────

25  [6] Summary judgment on this plaintiff's IIED claim was ultimately granted (CV-03-0470-PHX-NVW) by the newly-assigned district judge on August 26, 2006. Finding that the

26  co-employee's offensive conduct did not rise to the level of egregious conduct that Arizona courts have found sufficient to submit an IIED claim to a jury, even though the district judge

27  explained that the allegations were sufficient to survive a motion to dismiss in 2004. See, 323

28  F. Supp.2d 997 (D. Ariz. 2004). Judgment was entered against plaintiff on August 26, 2006.

1     In considering the third prong of an IIED claim - that a plaintiff suffered

2  "severe emotional distress" - terms that are not not readily capable of precise legal definition,

3  Arizona courts apply a case-by-case analysis. *Lucchesi*, 716 P.2d at 1016. "A line of

4  demarcation should be drawn between conduct likely to cause mere 'emotional distress' and

5  that causing 'severe emotional distress.'" *Midas Muffler Shop v. Ellison*, 650 P.2d 496, 501

6  (Ariz.App.1982). "Crying, being stressed and upset, and having headaches [are] not enough

7  to establish severe harm." *E.E.O.C. v. GLC Restaurants, Inc.*, 2006 WL 3052224 at*9 (D.

8  Ariz. 2006) (citing *Spratt v. Northern Automotive Corp.*, 958 F.Supp. 456, 461

9  (D.Ariz.1996)). "Nor is difficulty sleeping sufficient." *Id*. (citing *Midas Muffler Shop*, 650

10 P.2d at 501). "Shock, stress, moodiness, and estrangement from friends and coworkers [are]

11 not severe" enough emotional distress to warrant an IIED claim.  *Id*. (citing *Bodett v.*

12 *Coxcom*, 366 F.3d 736, 747 (9th Cir.2004). "In contrast, anxiety that results in physical

13 symptoms such as high blood pressure, chest pains, fatigue, and dizziness constitute severe

14 emotional distress." *Id*. (citing *Ford*, 734 P.2d at 583). Anger and depression coupled with

15 physical ailments such as headaches and hemorrhoids as a result of losing contact with one's

16 child have also been found to constitute severe emotional distress. *Id*. (citing *Pankratz*, 744

17 P.2d at 1191).

18     In *E.E.O.C. v. GLC Restaurants, Inc.*, the district judge was confronted with

19 four minors who suffered from various symptoms that they related to the adult co-

20 employee/offender's workplace conduct: depression, anxiety, dreams of the offender touching

21 them, sleeping and eating problems, medical treatment for depression, prescriptions for anti-

22 depressants and sleeping pills, recommendations to consult a counselor or psychiatrist,

23 distrust of men, and physical symptoms, such as, bloody nose, and vomiting four or five

24 times. The district judge found that "Plaintiffs' emotional effects approach the line of

25 demarcation between emotional distress and severe emotional distress, but they do not cross

26 it."  *GLC Restaurants, Inc.*, 2006 WL 3052224 at *9.  Summary judgment was granted

27 against all four Plaintiffs on their IIED claim because the Plaintiffs failed to create a question

28 of fact on the third prong.

**3. The Statute of Limitations on an Arizona IIED Claim**

The Arizona statute of limitations[7] for a personal injury action is two years, commencing on the date the action accrues. A.R.S. § 12-542(1). Arizona courts have concluded that the two-year limitations period found in A.R.S. §12-542 applies to IIED claims. *Hansen v. Stoll*, 130 Ariz. 454, 460, 636 P.2d 1236, 1242 (Ariz. Ct. App. 1981); *Orr v. Bank of America*, 285 F.3d 764, 780-81 (9th Cir.2002).

The purpose of the statute of limitations is to "protect defendants and the courts from litigation of stale claims in which 'plaintiffs have slept on their rights and evidence may have been lost or witnesses' memories faded.'" *Nolde v. Frankie*, 192 Ariz. 276, 279, 964 P.2d 477, 480 (1998)(*en banc*) (quoting *Brooks v. Southern Pac. Co.*, 105 Ariz. 442, 444, 466 P.2d 736, 738 (1970)).  However, to prevent defendants from using the statute of limitations as "a shield for inequity," Arizona courts recognize certain equitable exceptions to the statute of limitations when necessary to prevent injustice.  *Nolde*, 192 Ariz. 276, 279, 964 P.2d 477, 480 (internal citations omitted). Examples of equitable exceptions include estoppel by inducement which applies when a defendant induces a plaintiff to forbear filing suit, *id*. at 280, 481, a defendant's fraudulent concealment of the cause of action and any legal disability of the plaintiff.[8]  *Hosagai v. Kadota*, 145 Ariz. 227, 700 P.2d 1327 (1985).

---

[7] As an affirmative defense, a statute of limitations defense may be waived if not plead affirmatively. *Ashton v. Glaze*, 95 F.2d 427 (9th Cir. 1938); Rule 8(c), FED.R.CIV.P.; *Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 541, 647 P.2d 1127, 1139 (1982), *cert. denied* 459 U.S. 1070 (1982). Defendants' Answers have sufficiently raised this defense: "Some or all of Plaintiffs' claims are barred by the applicable statute of limitations." (docket # 67, # 71, # 73, and # 74)

[8] Plaintiffs' Memorandum of Law (docket # 398), filed December 21, 2006, raises an interesting issue whether an IIED claim is a "continuing tort" so that the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases, citing, among others, *Anderson v. State*, 88 Haw. 241, 965 P.2d 783, 790 (App. 1998); also see *Curtis v. Firth*, 123 Idaho 598, 850 P.2d 749, 754 (1993) (a claim for IIED was a continuing tort for purposes of a statute of limitations).
No Arizona appellate court to date has directly addressed whether an IIED claim is a continuing tort and, if so, what effect such tort would have on conduct occurring outside

1    In this case, neither side initially addressed in their briefing the statute of

2    limitations applicable to Plaintiffs' IIED claims. Because some of the Plaintiffs' allegations

3    are based on conduct dating back to 1997 but suit was not filed until June 14, 2004, there

4    appears to be a statute of limitations issue on some of Plaintiffs' IIED claims.  The Court,

5    therefore, ordered the parties to submit limited simultaneous supplemental briefing on this

6    issue discussing the applicable statute of limitations but only as to Plaintiffs Betty Ann St.

7    George, Robbin Billingsley, Dawn Hixenbaugh, Diane Wickline, Janet Reavis, and Abbey

8    Bromley. The Court now concludes that it is not necessary to conduct a limitations analysis

9    on these Plaintiffs' IIED claims because its ruling herein on other well-settled issues under

10   Arizona law is dispositive.

11                                   **<u>DISCUSSION</u>**

12    The Court has painstakingly examined the alleged conduct of all Defendants

13   *vis a vis* each Plaintiff and concludes that all Plaintiffs except six, *viz.*, Betty Ann St. George,

14   Robbin Billingsley, Dawn Hixenbaugh, Diane Wickline, Janet Reavis, and Abbey Bromley,

15   have not created a colorable question of fact whether the conduct of Defendants, either

16   jointly or collectively, was "'so outrageous in character and so extreme in degree, as to go

17   beyond all possible bounds of decency, and [is] regarded as atrocious and utterly intolerable

18

19

20

---

21   the two-year limitations period. Nevertheless, in a sexual abuse case entitled *Floyd v.*

22   *Donahue*, 186 Ariz. 409, 923 P.2d 875 (Ct.App.1996), the Arizona Court of Appeals stated

23   in *dicta* that it would "agree that under certain conditions a tort is continuous, and in such
     cases the limitations period does not commence until the date of the last tortious act,"(citing

24   *Garcia v. Sumrall*, 58 Ariz. 526, 533, 121 P.2d 640, 643 (1942) (a case involving trespass
     to property)). However, the *Floyd* court determined that the continuing tort rule did not apply

25   in that case because each claimed act was a separate assault causing separate as well as

26   cumulative injury.
          The Court will not engage in the unnecessary analysis whether an IIED claim is a

27   continuing tort under Arizona law because its ruling herein on other well-settled issues of law

28   is dispositive and this issue was not sufficiently raised and argued by the parties in their
     moving and responsive briefing.

in a civilized community.'"[9]  *Patton*, 578 P.2d at 155.  Even in the presence of the *Butler* decree, the conduct, if true as alleged by the other Plaintiffs, was certainly rude, sophomoric, crude, disrespectful and even deplorable or criminal in nature. The alleged conduct did not, however, fall within "that quite narrow range of 'extreme and outrageous' conduct needed to establish a claim of emotional distress." *Watts*, 619 P.2d at 1035. As to Plaintiffs Betty Ann St. George, Robbin Billingsley, Dawn Hixenbaugh, Diane Wickline, Janet Reavis, and Abbey Bromley, the Court will examine the third prong (whether these Plaintiffs suffered severe emotional distress) in more detail in the context of their individual complaints and symptoms.

**1. Betty Ann St. George**

Plaintiff Betty Ann St. George[10] claims that throughout her six-year employment at the Prescott Home Depot, she was frequently[11] called "rude" and derogatory names,[12] such as, "big mouth," "fat-ass," and "bitch" by male associates Richard Nelson and

---

[9] The Court is not suggesting that by identifying these individual Plaintiffs, their counsel has created a question of fact for jury determination on the first prong of outrageous and extreme conduct. Rather, when managing a case with twenty-one Plaintiffs, the Court finds it more efficient and better use of the Court's limited time to examine the third prong to determine if these individual Plaintiffs satisfy the third prong before a more in-depth analysis is completed on the first. The absence of any of the three IIED elements is fatal to such a claim.

[10] St.George began her employment with the Prescott Home Depot on December 29, 1997, (PSOF ¶ 134; docket # 363), and was terminated on December 16, 2003. (PSOF ¶ 143)

[11] "at least, once or twice a week." (Exh. 2, St. George deposition, at 136:13-14.

[12] The Court's review of the record cited by St.George's counsel failed to reveal where St.George was called "cunt," a most-degrading word for a woman. It is not found in the record where St.George's counsel cites it for factual support. Thus, the Court assumes it does not exist in the record. The record does, however, support that Richard Nelson called other women names like: "'that cunt, 'that bitch,' 'that slut,' 'that whore.' That's how Richard talks about women that he's not sleeping with that week. . . ." (Exh. 3, St.George deposition, 226:10-19)

Steve Machek, who would also "flip[ her] off" or "grab[] his crotch[.]"[13] (PSOF ¶145; Exh. 2, St.George deposition, at 133:18-21[14])  St.George testified that employee Richard Nelson spit at her[15] but the record cited by Plaintiff St.George is not clear on the frequency that the spitting occurred.[16]  (PSOF ¶146; Exh. 2 at 138:13-16.)  St.George claims that she repeatedly reported to management throughout her employment that male associates and male managers were making "lewd gestures"[17] and "sexual gestures,"[18] including, but not limited to "masturbation gestures,"[19] "grabbing their genitals," and "tongue in fingers gestures,"[20] directed at herself, other female associates and female customers, but, she claims, her complaints were ignored by management. (PSOF ¶147; Exh. 3, St.George deposition at

---

[13] From March 2003 forward, Richard Nelson "did the same thing to me in that time period as the same thing he did from the day I started working with this guy. If he's upset with you, and he walks by you, and he flips you off or he mouths the word 'bitch' or grabs his crotch- it's an ongoing thing, everyday, all-the-time thing with Richard." (PSOF ¶145; Exh. 2, at 136:22-137:11)  The Court is not directed to any other male associate calling St. George these vulgarities.

[14] "[Steve Machek] called - his favorite thing for me was 'big mouth,' 'fat ass,' 'bitch." Always telling me to keep my nose out of his business if I wanted to keep my fucking job. Those are Steve Machek's words." (Exh. 2 at 133:18-21)

[15] If Nelson's spit landed, or nearly landed, on Plaintiff's person, the spitting may be considered a Class 3 misdemeanor assault under Arizona law. See, A.R.S. § 13-1203A)(3) and (B); *State v. Mathews*, 130 Ariz. 46, 633 P.2d 1039 (Ariz. App. 1981) (faking a striking blow at a police officer constitutes aggravated assault since "touching" does not require person-to-person contact).

[16] St. George testified that she believes that "Richard Nelson should have been fired the first time he spit at me." (PSOF; Exh 1C at 253:18-21)  This implies it occurred on more than one occasion.

[17] The record cited by St.George's counsel does not support this allegation.

[18]*Id.*

[19] *Id.*

[20] *Id.*

- 15 -

272:1-24, 275:9-20[21]; Exh. 24, Part 6, called ""BSG Exhibit C - Defendant Felix Pareja," pp. 1-14; docket # 367)  St.George claims that she would "walk away" as the store manager's (Pareja's) response was to laugh and state "you work in a warehouse, what do you want."[22] (PSOF ¶ 147; Exh. 3, St. George deposition, at 272:21-25, 275:9-20, St. George Binder, Section C-Pareja, pp. 1-14[23]).

St.George claims she was physically threatened by Richard Nelson in the Home Depot break room in mid-2000 when he told her to "shut the fuck up bitch, I'll beat the shit out of you."[24]  This comment was directed at St.George after she heard Nelson discussing that his former wife had charged him with disorderly conduct and domestic violence. Nelson allegedly stated in reference to his former wife that "[i]nstead of just beating the shit out of her, I should have just killed the fucking cunt."[25] St.George claims that she immediately reported this to Pareja, who simply replied "I do not have time for this now," (PSOF ¶148; St. George Binder, section C-Pareja, pp. 6-7.[26]), or "Were you born blond?" (Exh.3, 275:9-13)  St.George claims that after she was called derogatory names by some of

---

[21] This cited reference in the record supports Pareja saying to St.George, "Where you born blonde?" (Exh. 2 at 275:12-13)

[22] *Supra*, n. 17.

[23] The Court has unsuccessfully tried to find where in these 14 unnumbered pages this factual allegation exists. Thus, for purposes of this Order, the Court assumes it does not exist.

[24] *Supra*, n. 17.  Elsewhere, however, the record supports St.George's claim that Richard Nelson said to her: "Well, fuck you, I wasn't talking to you." (Exh. 3, St.George deposition, 227:3-12)

[25] *Infra*. n. 26 at p.17.

[26] This is apparently contained in notes made by, and referred to during, St.George's deposition and is actually found at Exh. 4, BSG Exhibit C at 17. Even though the pages are not numbered by Plaintiffs' counsel as he represents, the Court was able to locate an incident allegedly in early, 2000, when St.George went to Pareja to complain about the poor treatment of Janet Revis who was in tears, and Pareja allegedly "physically '**pushed**' [St. George] out [of his office], saying 'I don't want to hear any of your shit' and slammed the office door." (docket # 367-6 at 17) (Emphasis in original)

the male co-employees and reported them to other managers, such as, Musen, Pareja, Johnson and Ingolia, she was repeatedly told "we'll take care of it, just leave them alone," or simply told "what's you're problem with Richard and Steve, you are always back here complaining about them," inferring that St.George was the instigator instead of the victim. (PSOF § 149; St. George deposition (Exh. 2) at 138:13-15, St. George Binder, Section C-Pareja 1-14, Section D-Machek, pp. 1-10, Section E-Johnson, pp. 1-10, Section Fingolia, pp. 1-6, and Section G-Musen, pp. 1-5.[27])

St.George's claims IIED conduct include the following: that she was physically threatened by Richard Nelson, a non-Defendant, in the Home Depot break room in mid-2000 when Nelson told St.George to "shut the fuck up bitch, I'll beat the shit out of you," (PSOF ¶ 148, docket # 363); that she was often told "fuck you," or "fuck you, bitch," and "flipped off" by Richard Nelson and Defendant/Assistant Store Manager, Steve Machek, (*Id.* at ¶ 149); that when these incidents were reported to other managers such as Musen, Pareja, Johnson and Ingolia, she was repeatedly told "we'll take care of it, just leave them alone," or simply told "what's you're problem with Richard and Steve, you are always back here complaining about them." (*Id.*)

St.George claims she "suffered physically from headaches, anxiety, stress related illnesses, weight fluctuations, sleeplessness and nervousness for the previous nine years that she attributes to working under the conditions at the Prescott Home Depot." (PSOF ¶ 154; docket # 363 at 30[28])  Although several years have passed since her termination from Home Depot in December, 2003, St.George claimed at her deposition that she still feels anxious and nervous, that her heart "races" when she "bumps into" Pareja, Machek, or

---

[27] *Supra.* n. 17.

[28] Plaintiffs' counsel's failure to comply with LRCiv 56.1(b) by providing for each fact in a separately numbered paragraph where that fact finds support in the record has made writing this Order extremely more difficult and time consuming. Additionally, simply referring to, for example "See St. George dep. at 227:23-232:4" (PSOF ¶ 154) without any reference to an exhibit number has significantly contributed to the Court's challenge of finding support in the record for Plaintiffs' claims.

1    Nelson around town, because of the potential for confrontation. She has, on more than one

2    occasion, encountered one of the named defendants at WalMart, Costco, Harkins Theaters,

3    Hastings and other Prescott establishments because Prescott is a very small community, and

4    has been the target of "dirty looks," "stares" and has been "flipped off" by Nelson.  She

5    claims she experienced "night-mares" regarding Pareja and Machek harming her and her son.

6    During the time period when she was employed with Home Depot from 1997 through 2003,

7    St.George claims she suffered from nervous tension, high levels of anxiety, panic-attacks,

8    depression, sleeplessness, weight fluctuations due to stress, headaches, and a constant feeling

9    of "walking on eggshells." (PSOF ¶ 154; Exh. 3, St. George dep. at 227:23-232:4[29])

10           Defendants' Reply contends that St.George's "entire response dealing with her

11   IIED claim fails to provide even one example, supported by admissible evidence, of any

12   named Defendant engaging in extreme or outrageous conduct directed at her." (docket # 371

13   at 39)  Defendants argue that St.George's Response "is completely void of any admissible

14   evidence that she experienced severe emotional distress as a result of such actions." (*Id*.)

15   Defendants claim that because St. George's "attributes'" her various ailments to Home Depot

16   is insufficient, standing alone, to meet the prima facie test at the summary judgment stage."

17   (*Id*.)  While less than clear, Defendants seemingly argue that expert testimony is necessary

18   to opine that Defendants' conduct is what caused St.George's emotional distress.[30]

19

20           [29] *Supra*., n. 17.  Nothing in this portion of St.George's deposition, cited by Plaintiffs'

21   counsel, supports these claims of symptoms related emotional distress.

22           [30] The Court's November 30, 2006 Order gave the parties an opportunity to address
     another legal issue: whether only expert testimony, e.g., a physician or psychologist, may
23   create a question of fact that a plaintiff sustained emotional distress caused by a defendant's
     conduct and, if not, whether a party or other non-expert witness may appropriately testify
24   regarding personal opinions, observations, personal experiences, such as, commonly-known
     symptoms of emotional distress, such as, nightmares, caused by a defendant's conduct and/or
25   failure to act when required to do so.

26           Plaintiffs elected not to address the issue at all in their Memorandum. (docket # 398)
27   Defendants' Memorandum of Law on IIED Claims cites case law from other state courts and
     a distinguishable Rhode Island district court case which "require expert testimony to
28   substantiate claims of severe emotional distress." (docket # 400 at 6-8)  While the result may

be the same, Defendants' reliance on state law regarding the admissibility of evidence in this case is misplaced.

The Federal Rules of Evidence govern the admissibility of evidence in diversity cases, except in the rare circumstance where a state rule of evidence is "'intimately bound up' with the rights and obligations being asserted []." *Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir.1995) (quoting *Erie R.R. Co. v. Tompkins*, 304 U.S. at 78); *Feldman v. Allstate Ins. Co.*, 322 F.3d 660 (9th Cir. 2003) ("Pursuant to *Erie* and its progeny, federal courts sitting in diversity apply state substantive law and federal procedural law."). With respect to the IIED issues presently before the Court, no state evidentiary rule supplants the federal rules and, therefore, the Federal Rules of Evidence control this case.

"Causation is generally a question of fact for the jury unless the proof is insufficient to raise a reasonable inference that the act complained of was the proximate cause of the injury." *Lies v. Farrell Lines, Inc*., 641 F.2d 765, 770 (9th Cir.1981). Nevertheless, the Ninth Circuit has held that expert medical testimony establishing a causal link must be presented when drawing a particular conclusion that requires specialized knowledge. In *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499 (9th Cir.1994), the plaintiffs alleged that they suffered from a variety of ailments stemming from their exposure to various chemicals while working at defendants' shop. *Id*. at 499. Some of these ailments included "dyscalculia" (poor arithmetic ability) and "spelling dispraxia" (poor spelling ability). *Id*. at 502.

The *Claar* court found that the plaintiffs' injuries in that case were not the type where a juror would be qualified to determine whether the railroad's negligence played a part in causing the injuries. *Id*. Therefore, the court determined that expert testimony was "necessary to establish even that small quantum of causation required by FELA." *Id*.

The *Claar* court approvingly cited *Moody v. Maine Central Railroad Co.*, 823 F.2d 693 (1st Cir.1987), wherein the plaintiff sought to prove that harassment by his employer caused him emotional distress which led to fatigue and angina attacks. 29 F.3d at 504. The *Moody* court held that in the absence of expert medical testimony linking the plaintiff's workplace harassment with his physical injury, no triable issue existed on causation and granted summary judgment for the railroad, noting that "plaintiff alleg[ed] a condition . . . manifested only by subjective pain and allegedly arising from a series of work related pressures, and not from any traumatic 'accident' or event that jurors, as a matter of everyday experience, could causally connect with the injury alleged." *Moody*, 823 F.2d at 696. Citing 4 F. Harper, F. James, O. Gray, *The Law of Torts* § 20.2 (2d ed. 1986), the *Moody* court stated that "[e]xpert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile." *Id*.; *contra*, Pa*ssantino v. Johnson & Johnson Consumer Products, Inc*., 212 F.3d 493, 513 (9th Cir. 2000) (without calling a medical expert, plaintiff's testimony, corroborated by her husband's and sister's testimony, that she experienced substantial anxiety, rashes, stomach problems, and other symptoms due to defendant's Title VII retaliation were sufficient to support verdict on emotional distress damages); *Williams v. Trader Publishing Company*, 218 F.3d 481, 486 (5th Cir. 2000) (plaintiff's testimony of sleep loss, beginning smoking and

- 19 -

1   Defendants urge that the summary judgment be granted.

2   **2. Robbin Billingsley**

3              Plaintiff Robbin Billingsley claims she "suffers from weight gain, stress,

4   headaches, depression, and anxiety." (docket # 362 at 41; PSOF ¶ 168)  Apparently at her

5   deposition, Billingsley "broke down" and tried to put into words how she feels when

6   Defendants apparently got a "kick" out of seeing the women employees react emotionally to

7   their conduct. (Id.)

8              Defendants contend, among others, that Billingsley "failed to provide any

9   admissible evidence that these symptoms constitutes 'severe emotional distress' as required

10  in IIED claims . . . ." (docket # 371 at 42)

11

12  **3. Dawn Hixenbaugh**

13             Plaintiff Hixenbaugh testified that she reached the point that she felt "sick to

14  her stomach when pulling into the Prescott Home Depot parking lot." (docket # 362 at 44;

15  PSOF ¶ 177)  She expressed feelings of being "drained" and "hopeless, feeling like she had

16  put in almost 15 years into this company and did not like the idea of having to 'start over

17  again' somewhere else." (*Id.*) Plaintiff Hixenbaugh testified that she spent everything she had

18  to get the transfer to the Prescott Home Depot, hoping to get a "fresh start" from her negative

19  experiences at the Cave Creek Home Depot in Phoenix, where she worked for eight years.

20  After the *Butler* case settled, she believed "things would change" but she eventually realized

21  while working at the Prescott Home Depot when she experienced the same inappropriate

22  behavior that Home Depot is "a boys club" and it "would never change."

23  ───────────────

24  severe weight loss due to defendant's wrongful discharge sufficient to support jury's deter-
    mination of compensatory damages).

25       Again, the Court will not engage in the unnecessary analysis whether expert testimony

26  is necessary for Plaintiffs to establish a *prima facie* case because its ruling herein on other
    well-settled issues is dispositive and this issue was not sufficiently raised and argued by the

27  parties in their moving and responsive briefing.

28

1    Defendants' Reply argues that Plaintiff Hixenbaugh's "disappointment in being

2    able to 'start over' at Store # 452 and how she feels 'sick to her stomach when pulling into the

3    Prescott Home Depot[,]" are "subjective feelings [which] do nothing to support her claim of

4    IIED against the Defendants." (docket # 371 at 35) "Moreover, her reference to the

5    Butler/Frank case is not only irrelevant,[31] but [is] also not supported by her PSOF 177." (*Id.*)

6    **4. Diane Wickline**

7    Plaintiff Wickline, a cashier, testified that she used a chair on occasion to sit

8    down due to numbness in her legs. (docket # 362 and # 366[32]; PSOF ¶ 283; Exh. 15 at 168)

9    Wickline testified that she has fallen at work several times due to weakness in her legs.

10   (PSOF ¶ 283; Exh.15 at p.165)  She claims that Ingolia was aware that Wickline had a

11   medical need related to her legs and that a copy of Wickline's doctor's note was in her

12   personnel file. Wickline complained in her call to the Alert Line that Pareja knew of her

13   medical condition.[33] Plaintiff claims that Defendant Pareja told Wickline's Department

14   Supervisor, Chris Hostas, to "throw away that chair" and that Pareja threw away Wickline's

15   chair on three different occasions, despite her physician's note for use of the chair. (docket

16   # 362; PSOF ¶ 285; Exh.15 at p. 168)  Wickline was so upset about having Pareja removing

17   her chair and yelling at her for having a chair that Wickline contacted the Alert Line to

18   complain about Pareja's conduct.

19   Apparently, unrelated to the chair issue, in October, 2004, Wickline

20   accidentally bumped into a yucca plant in the garden department and it stuck her in the arm.

21   (PSOF ¶ 285; Exh. 15, p. 113)  After seeing the Home Depot physician, she was directed to

22

23

24   [31] Defendants' irrelevance objection to the *Butler* case on the IIED claim is overruled.

25   [32] Although using tabs with every Plaintiff's name on the chamber's hard copy is
     helpful, Plaintiffs' counsel's failure to provide an exhibits index or identify an exhibit number
26   for each exhibit referenced in their Statement of Facts for each Plaintiff added significantly
     more time for the Court to find the support in the record, assuming it was found or existed.
27

28   [33] Much of what Plaintiff Wickline claims Ingolia knew or what may have been in her
     file is not where Plaintiffs' counsel directs that it is in the record.

1    wear a sling while at work. (*Id.* at 114)  The next day, her supervisor, Chris Hostas, saw the

2    sling and asked what happened? Wickline testified that she said, "Oh, a yucca plant stuck me

3    and the doctor said I'm allergic to it."  Wickline testified that Hostas then said: "Oh, now we

4    can call you 'bitch prick,' you know."  (*Id.*)  Wickline testified that she said "Thanks a lot,"

5    became upset by the remark, walked away and cried. Wickline testified she reported it to

6    Priscilla Ingolia who responded, "[it's] only a joke."  (*Id.* at 115)

7             Defendants argue that Plaintiff Wickline "makes no attempt to offer any

8    admissible evidence that she suffered severe emotional distress over [the Defendants'] alleged

9    actions." (docket # 371 at 12)

10   **5.  Janet Reavis**

11            Plaintiff Reavis claims that when she complained to Store Manager Felix

12   Pareja about former Prescott Home Depot male associate Bob Kitzman "rubbing himself up

13   against [Reavis] from behind and touching [Reavis'] breasts," "running his hands through my

14   hair and started massaging [Reavis'] shoulders," Pareja stated to Reavis "whaa, whaa, whaa"

15   and Pareja "physically pushed" Reavis out of his office and "slammed the door shut." (docket

16   # 362 at 72; PSOF ¶ 297; Exh. 17 at Vol. I, p.107 - 108)  Plaintiff Reavis further testified

17   that "the next day" "Kitzman was suddenly transferred into the computer room to work side

18   by side with Reavis in a room that is approximately 6' x 15', and the door [was] always

19   locked." In the computer room, Reavis alleges that Kitzman continued to inappropriately

20   touch Reavis.[34]  (PSOF ¶ 306; Exh.17, Vol. I, at 110 - 111)  Although she doesn't recall the

21   date the first incident occurred, Reavis acknowledged that Kitzman voluntarily left the

22   Prescott Home Depot on January 17, 2001 and she hasn't seen him since then. (*Id.* at  p.

23

24

25

26

27            [34] No details are provided the Court as to how many times Reavis was inappropriately
     touched, over what period of time, what Reavis said or did to discourage or avoid Kitzman's
28   inappropriate conduct. The Court will not use speculation to assist Plaintiff Reavis to meet
     her burden of proof.

112:21-23)  Reavis claims she "felt scared and threatened by this action on Pareja's part."[35]
She resigned from the Prescott Home Depot on or about April, 2004.[36]

Like their arguments against Plaintiff Wickline's IIED claim, Defendants claim
that "Reavis offers absolutely no evidence that she suffered any severe emotional distress as
a result of any of the individually named defendants' conduct, or of any action taken by
Home Depot." (docket #371 at 22)

**6. Abbey Bromley**

Plaintiff Bromley testified that she once told co-plaintiff, Joni Kirchner, that
when she comes to work "'I just feel like I stand here and I'm getting raped.' I can't stand it
anymore. I got brutally raped a year before I started working [at the Prescott Home Depot].
I know what that feels like, and that's how I feel everyday I walk into this store and, you
know, since Richard [Nelson] has been gone, I feel so much better. I feel like I've never been
around so many sick people in my life."  (docket # 362 at 77; Plaintiffs' Exh.19, 51:6-18)
Plaintiffs' counsel fails, however, to identify the "extreme and outrageous conduct" that
causes Bromley to have these feelings. It certainly isn't where counsel says that it is. (docket
# 362 at 77-78 cited as "**Abbey Bromley's Allegations of Intentional Infliction of
Emotional Distress**")

Plaintiff Bromley's citation to the record in Plaintiffs' Statement of Facts, *viz.*,

---

[35] At the end of PSOF ¶ 303, Plaintiffs' counsel cites  "(See Reavis dep. Volume II,
at 131:12-132:2.)" for the specific support of Plaintiff Reavis' claim of emotional distress.
Unfortunately for Plaintiff Reavis, this specific citation to the record does not provide any
support for these symptoms of emotional distress. Although not required to do so, the Court
spent significant time reading portions of Reavis' two deposition transcripts in an attempt to
overcome this deficiency and to find this factual support but no such support was found. The
Court treats this factual allegation as non-existent in the record. (docket # 396; *Carmen*, 237
F.3d at 1031)  Even if the Court were to find these specific factual allegations in the record
to support Plaintiff Reavis' claim of emotional distress, feelings of being "scared and
threatened" without more are insufficient to meet Arizona's high threshold for a viable claim
of severe emotional distress.

[36] Plaintiff's Statement of Facts erroneously cites "See Reavis dep. [Vol. I] at 24:3-6"
(docket # 363 at 66:24-25) for Reavis' employment termination date. This citation is only
support for Reavis' hire date of January 5th, 1998.

1   PSOF 314; Plaintiffs' Exh. 19, Bromley dep. Volume I, at 51:9-17, 118:20-120:12, 121:12-

2   123:25, 143:15-25, does not support all the symptoms of emotional distress alleged in

3   Plaintiffs' Response.  (docket # 363 at 72-73)  Defendants point this deficiency out in

4   footnote 47 of their Reply. (docket # 371 at 29 n. 47)  Bromley's cited deposition supports

5   the following claims of emotional distress: 1) that Mr. Machek made "threats" to others that

6   Bromley "had better watch [her] job," (Exh. 19, Bromley dep. Volume I, at 119:18-23); 2)

7   "the yelling incident" by Defendant Pareja, (*Id*. at 120:9-12);  3) that Bromley is suffering

8   from "migraine headaches" which she acknowledged she has had "since childhood" but they

9   have "gotten worse" by working at the Prescott Home Depot, (*Id*. at 121:12-23 and 143:15-

10  19); 4) that Bromley claims that "[e]very day I go home crying" and "I can't sleep." (*Id*. at

11  122:4-7);  5) that while she and her husband have not separated nor have they sought

12  marriage counseling, Bromley testified her marriage has suffered from "[j]ust the tension,

13  emotional pain" because my husband "sees me crying." (*Id*. at 122: 13-123:1);  6) that she

14  "feel[s] humiliation" and she was "scared of retaliation" upon return to work after she gave

15  her deposition. (*Id*. at 123:9-18); and, 7) that she is "nervous," "angry" and feels "like I'm

16  being raped ever time I walk into the [Home Depot] building." (*Id*. at 143:20-25)

17          Defendants counter that Bromley "cannot produce any admissible evidence of

18  extreme and outrageous conduct against any of the named Defendants. With this critical

19  evidence missing, and with no admissible evidence that her 'stress headaches' were caused

20  by any of the actions of the Defendants, Bromley's claim of IIED against all of the named

21  Defendants should be dismissed." (docket # 371 at 29 - 30).

22                                    **CONCLUSION**

23          The Court concludes that none of the twenty-one Plaintiffs meet both the high

24  thresholds for extreme and outrageous conduct and severe emotional distress required under

25  Arizona law to create a jury question. While the IIED claims of Plaintiffs Reavis and

26  Bromley, like the four minor plaintiffs in *GLC Restaurants, Inc.*, may "approach the line of

27  demarcation between emotional distress and severe emotional distress, but they do not cross

28  it." *GLC Restaurants, Inc.*, 2006 WL 3052224 at *9.  Defendants are entitled to summary

1  judgement of Plaintiffs' IIED claims.

2  Accordingly,

3  **IT IS ORDERED** that Defendants' Motion for Summary Judgment on

4  Plaintiffs' Intentional Infliction of Emotional Distress Claim (Count VI)(docket # 353) is

5  hereby **GRANTED**. All Plaintiffs' Intentional Infliction of Emotional Distress claims are

6  hereby **DISMISSED** with prejudice.

7  Dated this 21st day of February, 2007.

8

9

10  Lawrence O. Anderson
United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28